**"UNDER SEAL"**

**FILED**
CHARLOTTE, NC

JUN 1 9 2018

US DISTRICT COURT
WESTERN DISTRICT OF NC

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. _3:18 cr 206-MOC_ |
| | ) | |
| v. | ) | BILL OF INDICTMENT |
| | ) | |
| (1) PIERRE YVELT ALMONOR | ) | Violations: 18 U.S.C. § 371 |
| ▉▉▉▉▉▉▉▉▉▉▉▉ | ) | 18 U.S.C. § 1028A |
| (3) UGO ERNEST UZOMBA | ) | 18 U.S.C. § 1349 |
| | ) | 18 U.S.C. § 1956(h) |

THE GRAND JURY CHARGES:

At the specified times and at all relevant times:

## I.   Introduction

1.      The defendants, Pierre Yvelt ALMONOR, ▉▉▉▉▉▉▉▉▉, and Ugo Ernest UZOMBA, conspired with one another and others known and unknown to carry out a fraudulent business email compromise scheme, in which they tricked law firms and other companies into wiring the proceeds of business transactions to accounts under the defendants' control.  After unlawfully gaining access to the victims' email accounts, the defendants and their coconspirators monitored the accounts for communications about large transactions.  Around the time of scheduled transactions, the defendants and their coconspirators sent bogus emails that appeared as if they were from one of the legitimate parties, but instead were designed to trick the victims into wiring funds associated with transactions to accounts controlled by the defendants and their coconspirators, rather than to the intended recipients' accounts.

2.      As part of the fraudulent scheme, the defendants and their coconspirators recruited individuals to open the bank accounts into which the stolen funds were diverted and to funnel the proceeds of the fraudulent scheme to accounts controlled by the defendants and their coconspirators, including accounts located outside the United States.  The defendants and their coconspirators either paid accountholders for use of the accounts, or tricked or threatened the accountholders into assisting with transfers by preying on their vulnerabilities, such as advanced age, through a variety of online schemes, including "romance" and "jail" schemes.

1

## II. Certain Individuals and Entities

3. The defendant, Pierre Yvelt ALMONOR, was a resident of Miami Gardens, Florida who participated in the business email compromise scheme by arranging the deposit of diverted funds and funneling the proceeds of the scheme to bank accounts located outside the United States. In furtherance of the business email compromise scheme, ALMONOR utilized a bank account for a business with which he was associated (SunTrust Bank, Account *2239).

4. The defendant, ████████████████████████ ██████ who managed transactions in the business email compromise scheme by recruiting and directing individuals to make deposits and transfers of stolen funds. ██████ used the email addresses scottjohnsongood@yahoo.com and scottjohnson147@yahoo.com to communicate with coconspirators and others in furtherance of the business email compromise scheme.

5. The defendant, Ugo Ernest UZOMBA, was a citizen of Nigeria residing in Mexico who opened bank accounts outside the United States for use in the business email compromise scheme and instructed others where to deposit stolen funds. UZOMBA used the email addresses mayor_ugo@yahoo.co.uk and ugo_uzomba@yahoo.com to communicate with coconspirators and in furtherance of the scheme. In addition, UZOMBA utilized the following bank accounts located in Mexico to receive and funnel stolen proceeds:

     a. UZOMBA, Banco Santander, S.A., Account *2687; and

     b. U-Grandes Operaciones S.A. De C. V., BBVA Bancomer, Account *1785.

6. Individual A was a coconspirator in the business email compromise scheme who recruited others to deposit diverted funds and provided wiring instructions for the deposit and transfer of stolen money into accounts located outside the United States. Individual A utilized the email address eizo_kobayishi100@hotmail.com to communicate with defendants and other coconspirators in furtherance of the business email compromise scheme.

7. MR was a resident of Sun City Center, Florida who was recruited by ██████ and others, known and unknown, through various schemes preying on her vulnerabilities, including her age. ██████ and other coconspirators directed MR to open bank accounts into which diverted funds were deposited and instructed MR where to wire the proceeds of the scheme. The following are accounts opened or used by MR in the fraudulent scheme:

     a. MLR International, JPMorgan Chase Bank, N.A., Account *0869;

     b. MR, JPMorgan Chase Bank, N.A., Account *3959;

     c. MLR International, BB&T Bank Account *1624; and

     d. MR, Wells Fargo Bank, Account *2822.

2

7.      Company A was a real estate investment company with a principal address in Naples, Florida that was a victim of the business email compromise scheme. JC, President of Company A, received a bogus email and was defrauded into wiring in excess of $300,000 to an account controlled by the defendants and their coconspirators.

8.      Attorney A was an attorney with offices in Charlotte, North Carolina who was a victim of the business email compromise scheme. Attorney A received a bogus email in connection with the closing of a property sold by JP and was defrauded into wiring more than $250,000 intended for JP to an account controlled by the defendants and their coconspirators.

9.      Attorney B was an attorney with offices in New York, New York who was a victim of the business email compromise scheme. Attorney B received a bogus email in connection with the closing of a property sold by RH and was defrauded into wiring more than $260,000 intended for RH to an account controlled by the defendants and their coconspirators.

10.     Company B was a senior-care business located in Sarasota, Florida that was a victim of the business email compromise scheme. RK, Director of Finance at Company B, received a bogus email and was defrauded into wiring over $39,000 to an account controlled by the defendants and their coconspirators.

### III.     The Business Email Compromise Scheme

11.     In general, a business email compromise scheme is a type of computer-intrusion scheme in which the intruder gains access to the victim's computer system and monitors the victim's email. As part of the business email compromise scheme operated by defendants and their coconspirators, the intruders monitored the victims' email accounts to determine when large financial transactions were scheduled to take place. After the initial transfer or wiring instructions were conveyed between the legitimate parties to the transaction, the intruders sent "spoofed" emails designed to appear as if they were coming from one of the legitimate parties, but which in reality were sent by the intruders as part of the fraudulent scheme. The spoofed emails typically contained a change of plans, instructing that the money being wired between the legitimate parties go to a different account—one that was under the defendants' and their coconspirators' control.

12.     In furtherance of the email compromise scheme, the defendants and their coconspirators recruited individuals to open the accounts into which the diverted funds were deposited and then instructed those individuals to funnel the stolen money to specified accounts typically located outside of the United States. Several of the individuals recruited to open accounts, initiate wire transfers, and complete other tasks did so in exchange for a percentage of the total amount of wired money. Others who aided the fraudulent transfers were unemployed, underemployed, or retired and were recruited by the defendants and their coconspirators to participate in the scheme through techniques that preyed on the individuals' vulnerabilities, including advanced age, by offering companionship or threatening the individuals with jail if they did not comply.

3

### IV. Examples of Fraudulent Transactions Executed in Furtherance of the Business Email Compromise Scheme

#### a. Company A

13. Beginning at least as early as in or about March 2015, and continuing through in or about April 2015, ▮▮▮▮ and Individual A corresponded with ALMONOR about utilizing an account to which ALMONOR had access to defraud Company A in connection with the business email compromise scheme. In exchange, ALMONOR would receive a percentage of the stolen money.

14. In or about April 2015, JC, President of Company A, received a spoofed email designed to appear as if it had been sent by the closing attorney retained by Company A in connection with the purchase of an apartment building. Instead, the bogus email was sent in connection with the business email compromise scheme and contained fraudulent wiring instructions.

15. On or about April 9, 2015, consistent with the fraudulent wiring instructions contained in the spoofed email, JC wired $394,795.43 intended for the purchase of the apartment building to the business account used by ALMONOR in furtherance of the business email compromise scheme (SunTrust Bank, Account *2239).

16. On or about April 13, 2015, ALMONOR sent an email to ▮▮▮▮ requesting information related to the transaction, including the sender's name, address, phone number, and bank name. ALMONOR wrote to ▮▮▮▮, "This is not a small transaction at all . . . Anything goes wrong that will be 15 to 20 years in prison."

17. On or about April 13, 2015, ALMONOR withdrew $57,250 of the diverted funds from Account *2239, representing, at least in part, ALMONOR's share of the stolen money.

18. On or about April 14, 2015, consistent with instructions provided by ▮▮▮▮ and Individual A, ALMONOR wired $177,657.75 of the stolen proceeds to a business bank account located in South Africa and $30,000 of the stolen proceeds to an individual bank account located in Spain.

19. On or about April 14, 2015, ▮▮▮▮ requested an update from ALMONOR via email. To which, ALMONOR responded, "All is done Sir," and advised ▮▮▮▮ to check with Individual A. ▮▮▮▮ replied, "[T]hat is nice we appreciate you very much and hope to do more business with you."

20. On or about April 15 and 16, 2016, ALMONOR notified ▮▮▮▮ and Individual A via email that there was a "big problem" after the bank reversed $124,750.08 from the deposit of the stolen funds into Account *2239. After the reversal, ALMONOR sent an email to ▮▮▮▮ requesting, "Call me back Sir . . . As soon as possible."

4

### b. Attorney A

21. On or about July 27, 2015, a paralegal working with Attorney A received a spoofed email designed to appear as if it had been sent by the real estate agent representing the seller, JP, in a transaction Attorney A was managing. The bogus email instructed Attorney A to wire the closing funds to a business account in the name "MLR International," (Chase Bank, Account *0869), which the email described as JP's business account but, which was, in fact, an account opened by MR at ▒▒▒▒'s direction for use in the business email compromise scheme.

22. On or about July 27, 2015, consistent with the instructions contained in the spoofed email, Attorney A's paralegal wired $272,595.57, representing the proceeds of the sale of JP's property, to Account *0869.

23. On or about July 28, 2015, ▒▒▒▒ communicated with others, known and unknown, regarding the wiring instructions for the stolen proceeds and then provided those instructions to MR.

24. On or about, July 28, 2015, MR transferred $252,300 of the stolen proceeds from Account *0869 to an individual bank account opened in her name (Chase Bank, Account *3959). MR then wired $116,000 from Account *3959 to an individual bank account located in Turkey, $136,000 to a business bank account located in Mexico, and $18,000 to an individual bank account controlled by UZOMBA in Mexico (Banco Santander, S.A., Account *2687).

25. Between on or about July 28, 2015, through on or about August 1, 2015, MR sent ▒▒▒▒ the receipts for the three wire transfers of the stolen funds to the foreign bank accounts, including UZOMBA's Account *2687.

### c. Attorney B

26. On or about October 15, 2015, Attorney B received a spoofed email designed to appear as if it had been sent by a seller, RH, in a real estate closing Attorney B was handling. The bogus email requested that Attorney B wire the closing funds to a business account in the name MLR International (BB&T Bank, Account *1624), which was a business bank account opened by MR at ▒▒▒▒'s direction for use in the business email compromise scheme.

27. On or about October 15, 2015, RH also received a spoofed email. The bogus email sent to RH was designed to appear as if it had been sent by Attorney B, advising RH that the wire with proceeds of the sale would not occur until the following week.

28. On or about October 19, 2015, consistent with the fraudulent instructions provided in the bogus email, Attorney B wired $269,526.18 to the MLR International account, Account *1624.

29. On or about October 19, 2015, UZOMBA sent an email to ▓▓▓▓ containing wiring instructions for a business bank account located in Mexico (U-Grandes Operaciones S.A. De C. V., BBVA Bancomer, Account *1785).

30. On or about October 19, 2015, ▓▓▓▓ sent wiring instructions to MR via email directing MR to make two $120,000 transfers with the stolen money, including one to the business account identified by UZOMBA, Account *1785, and another to an individual bank account located in Turkey.

31. On or about November 4, 2015, believing that the transfer was fraudulent, bank employees reversed the transaction and deposited the funds back into Attorney B's account, thwarting the efforts of ▓▓▓▓ and his coconspirators to funnel the proceeds to the foreign bank accounts with MR's assistance.

### d. Company B

32. On or about January 26, 2016, RK, Director of Finance at Company B, received a spoofed email designed to appear as if it had been sent by Company B's chief executive officer. The bogus email directed RK to transfer $39,109 to an individual bank account opened in MR's name (MR, Wells Fargo Bank, Account *2822).

33. On or about January 26, 2016, consistent with the fraudulent instructions in the bogus email, RK wired the funds from a Company B account to Account *2822.

34. On or about January 26, 2016, ▓▓▓▓ called MR to advise her that diverted funds from Company B would be deposited in MR's bank account.

35. Beginning on or about January 26, 2016, and continuing to on or about January 28, 2016, ▓▓▓▓ utilized unique account log-in information associated with MR to access Account *2822 and monitor the deposit and subsequent transfer of the funds stolen from Company B.

36. On or about January 29, 2016, believing that the transfer was fraudulent, bank employees reversed the transaction and sent the money back to Company B from Account *2822.

37. In sum, from in or about August 2014 through in or about November 2017, the defendants and their coconspirators diverted or attempted to divert in excess of $2,000,000 from multiple victim businesses and law firms in furtherance of the business email compromise scheme.

6

## COUNT ONE
## 18 U.S.C. § 1349
## (Wire Fraud Conspiracy)

38.    The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 37 of the Bill of Indictment, and further alleges that:

39.    From in or about August 2014 through in or about November 2017, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendants,

**(1) PIERRE YVELT ALMONOR,**
████████████████████████, **and**
**(3) UGO ERNEST UZOMBA**

did knowingly and intentionally combine, conspire, confederate, and agree with each other, Individual A, and others known and unknown to the Grand Jury, to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

### Object of the Conspiracy

40.    It was a part and an object of the conspiracy that the defendants, and others known and unknown to the Grand Jury, having devised the above-described scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purposes of executing said scheme and artifice, including interstate and international email communications and wire transfers, in violation of Title 18, United States Code, Section 1343.

### Manner and Means

41.    The defendants and their coconspirators carried out the conspiracy in the manner and means described in paragraphs 1 through 37 of this Bill of Indictment, among others.

All in violation of Title 18, United States Code, Section 1349.

7

## COUNT TWO
## 18 U.S.C. § 371
## (Conspiracy to Commit Computer Fraud)

42.     The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 37 of the Bill of Indictment, and further alleges that

43.     From in or about August 2014 through in or about November 2017, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendants,

**(1) PIERRE YVELT ALMONOR,**
████████████████████████**, and**
**(3) UGO ERNEST UZOMBA**

did knowingly combine, conspire, confederate, and agree with one another, Individual A, and others, known and unknown to the Grand Jury, to commit and attempt to commit fraud and related activity in connection with computers; that is, to execute a scheme and artifice to obtain from the electronic files and communications of real estate professionals and attorneys associated with Company A, Company B, Attorney A, and Attorney B—that is, information about pending wire transfers in order to redirect the scheduled transfers of funds to accounts under the control of defendants and their coconspirators, and for the purpose of executing and attempting to execute the scheme did intentionally access without authorization one or more computers and thereby obtained information from those protected computers, namely, information about intended wire transfers, worth in excess of $5,000, in violation of Title 18, United States Code, Section 1030(a)(2)(C), (a)(4), (c)(2)(B)(i), (c)(2)(B)(iii), and (c)(3)(A).

### Object of the Conspiracy

44.     It was an object of the conspiracy that the defendants and their coconspirators would unjustly enrich themselves by learning when money was to be wired in connection with real estate and other transactions and redirecting those funds to accounts controlled by the defendants.

### Manner and Means

45.     The defendants and their coconspirators carried out the conspiracy in the manner and means described in paragraphs 1 through 37 of this Bill of Indictment, among others.

### Overt Acts

46.     In furtherance of the conspiracy, and to accomplish the objects thereof, the defendants and their coconspirators committed one or more overt acts in the Western District of North Carolina and elsewhere, as described in paragraphs 1 through 37 of this Bill of Indictment.

All in violation of Title 18, United States Code, Section 371.

**COUNT THREE**
**18 U.S.C. § 1956(h)**
**(Money Laundering Conspiracy)**

47.     The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 37 of the Bill of Indictment, and further alleges that:

48.     From in or about August 2014 through in or about November 2017, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendants,

**(1) PIERRE YVELT ALMONOR,**
█████████████████████████████, **and**
**(3) UGO ERNEST UZOMBA**

did knowingly combine, conspire, confederate, and agree with each other, Individual A, and others known and unknown to the Grand Jury, to commit offenses against the United States, namely, violations of Title 18, United States Code, Sections 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), and 1957.

**Objects of the Conspiracy**

49.     It was a part and an object of the conspiracy that the defendants, and others known and unknown to the Grand Jury, would knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, with the intent to conceal and disguise in whole and in part the nature, location, source, ownership, and control of the proceeds of a specified unlawful activity, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

50.     It was a part and an object of the conspiracy that the defendants, and others known and unknown to the Grand Jury, would knowingly transport, transmit, and transfer, and attempt to transport, transmit, and transfer, funds from a place in the United States to or through a place outside the United States, which funds involved the proceeds of a specified unlawful activity, with the intent to conceal and disguise in whole and in part the nature, location, source, ownership, and control of the proceeds of a specified unlawful activity, and that while transporting, transmitting, and transferring, and attempting to transmit, transport, and transfer, such funds knew that the funds represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i); and

9

51.     It was a part and object of the conspiracy that the defendants, and others known and unknown to the Grand Jury, would knowingly engage and attempt to engage in monetary transactions affecting interstate and foreign commerce in property that was criminally derived from specified unlawful activity and was in excess of $10,000, knowing the property involved in the financial transactions represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1957.

### Manner and Means

52.     The defendants and their coconspirators carried out the conspiracy in the manner and means described in paragraphs 1 through 37 of this Bill of Indictment, among others.

All in violation of Title 18, United States Code, Section 1956(h).

### COUNT FOUR
### 18 U.S.C. § 1028A
### (Aggravated Identity Theft)

53.     The Grand Jury realleges and incorporates by reference herein the allegations contained in paragraphs 1 through 37 of the Bill of Indictment, and further alleges that:

54.     On or about January 26, 2016, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

did knowingly use, without lawful authority, a means of identification of another person, specifically, the name and unique electronic identification number of MR, during and in relation to the commission of one or more federal felony violations, to include, wire fraud conspiracy (18 U.S.C. §1349).

All in violation of Title 18, United States Code, Section 1028A(a)(1) and (b).

10

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

      a.     All property which constitutes or is derived from proceeds of the violations set forth in this Bill of Indictment;

      b.     All property involved in such violations or traceable to property involved in such violations; and

      c.     If, as set forth in 21 U.S.C. § 853(p), any property described in (a) or (b) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a) and (b).

The Grand Jury finds probable cause that the following property is subject to forfeiture on one or more of the grounds stated above: a forfeiture money judgment in the amount of at least $650,000, such amount constituting the proceeds of and property involved in the alleged offenses.

A TRUE BILL

R. ANDREW MURRAY
UNITED STATES ATTORNEY

WILLIAM M. MILLER
ASSISTANT UNITED STATES ATTORNEY

11